# Exhibit 1



**U.S. COMMODITY FUTURES TRADING COMMISSION**

Three Lafayette Centre
1155 21st Street, NW, Washington, DC 20581
Telephone: (202) 418-5260
Facsimile: (202) 418-5527

Division of
Market Oversight

CFTC Letter No. 14-130
No-Action
October 29, 2014
Division of Market Oversight

Neil Quigley
Deputy Vice-Chancellor, Research
Victoria University of Wellington
Macdiarmid Building, Am404
Kelburn Parade
Wellington, 6012, New Zealand

Re:   Victoria University of Wellington's Request for No-Action Letter regarding the Operation of a Small-Scale, Not-For-Profit Market for the Trading of Event Contracts for Educational Purposes

Dear Mr. Quigley:

This letter is in response to your letter to the Division of Market Oversight ("DMO" or "Division") of the Commodity Futures Trading Commission ("CFTC" or "Commission) dated August 26, 2014, requesting no-action relief that would allow Victoria University of Wellington, New Zealand ("Victoria University")[1] to operate a not-for-profit market for the trading of event contracts and the offering of such event contracts to U.S. persons.

As you note in your letter, the Division of Trading and Markets ("T&M"), which preceded DMO as the CFTC division with oversight responsibilities for regulated markets, granted no-action relief by letter dated June 18, 1993, to the University of Iowa to permit the operation of a non-profit electronic market ("Iowa Electronic Markets" or "IEM").[2] The IEM consists of submarkets for binary contracts concerning political elections and economic indicators — it is operated for academic research purposes only, and its operators, who are faculty at the University, receive no separate compensation.

---

[1] Victoria University was founded as Victoria College in 1897.  The University comprises four campuses, more than 2,000 staff and 16,000 students.  Additional information about the University's history, faculty, academic offerings, reputation, rankings, and related matters is available at http://www.victoria.ac.nz/about/.

[2] CFTC No-Action Letter No. 93-66 (June 18, 1993), *available at* http://www.cftc.gov/ucm/groups/public/@lrlettergeneral/documents/letter/93-66.pdf.

Victoria University proposes the creation of a small-scale, not-for-profit, online market for event contracts in the U.S. for educational purposes that will use the IEM as a model, with certain features that would vary from that model.  As such, you request on behalf of Victoria University similar no-action relief with respect to the operation of your proposed market for event contracts as was granted to the University of Iowa with respect to operation of the IEM.  In particular, you request that DMO recognize that Victoria University's market for event contracts, as proposed, should not be required to register as a designated contract market ("DCM") under section 5 of the Commodity Exchange Act ("CEA") and part 38 of the Commission's regulations, nor as a foreign board of trade ("FBOT") under section 4 of the CEA and part 48 of the Commission's regulations, and that its operators need not register under the CEA or the Commission's regulations.

## I. Background

Based upon the representations contained in your letter, as supplemented by telephone conversations with DMO staff, we understand the facts to be as follows.  Victoria University (henceforth "University") intends to operate two submarkets: one for political event contracts, and the other for economic indicator contracts.  The University proposes to utilize the results of the market information derived from trading in these contracts for educational and research purposes.  For example, the University plans to utilize the results from its market as teaching tools in its courses on statistical analysis, market theory, and trader psychology.  The University has also expressed plans to utilize the results to publish related research papers and analyses.

All of the proposed event contracts would be structured as follows:
- all contracts would be initially priced at $1;
- each contract for the correct outcome would pay off at $1, while all other contracts (i.e., contracts with incorrect outcomes) would not pay-off; and
- the price of each contract at any given time would reflect the probability that the traders believe that the event will happen.

The proposed submarket for political event contracts will include winner-take-all contracts to predict the following outcomes:
- which presidential nominee will win his or her party's primary, the general election popular vote, and the Electoral College;
- who will be the major party nominees for Vice President; and
- which party will control the next Congress.

The proposed submarket for economic indicator contracts will include winner-take-all contracts to predict monetary policy decisions of the Federal Open Market Committee regarding the federal funds target rate.  The University represents that it will not list any economic indicator contract that would compete with any contract that is listed by a CFTC-regulated contract market, and the University would not list more than five economic indicator contracts at any one

2

time. Participation in the submarket for economic indicator contracts would be limited to students, faculty and staff at any participating universities.[3]

By design, the University's model for its proposed market for event contracts bears many close similarities to the IEM model, including the following items:
- The University's key employees overseeing the project will be three University professors and one administrator.
- Neither the professors nor the administrator will receive any compensation or other payment, directly or indirectly, for operating the market.
- Neither the University nor any of the key personnel operating the proposed market is required to register with the Commission, nor is any of these persons or entities a business affiliate of any person required to register with the Commission.
- There will be no additional fees other than those necessary to cover the basic expenses of running the market, including the cost of credit card processing of deposits and withdrawals, fulfillment of the know-your-customer ("KYC") process,[4] and all other associated regulatory compliance and operating costs.
- Participants will execute their own trades, no brokerage service will be available or allowed, and no commissions will be charged.

However, the University's proposed market for event contracts would feature certain aspects that would distinguish it from the IEM model. The following four departures from the IEM model, you argue, would cause the University's market for event contracts to produce more accurate results, thereby furthering the educational public interest purpose of the project, by permitting:

  (1) a larger allowable number of traders in each contract;
  (2) a larger number of traders that are not affiliated with the University to trade political event contracts;
  (3) a larger allowable investment by any single market participant; and
  (4) a limited level of advertising.

**1. Number of traders in each contract**

Participation in IEM is limited to 2000 total traders in any particular election for which a political market is operated, and to 1000 total trades in any particular economic indicator submarket. The University proposes to have a limit of 5000 total traders in any particular contract, explaining that broader participation would make these contracts more efficient and effective prediction tools. The University anticipates that the higher proposed cap on participation, coupled with a higher maximum deposit limit (discussed below), would together

---

[3] The University represents that several U.S. universities have indicated a willingness to participate in the University's market for event contracts. Thus far, the University has neither sought nor obtained firm commitments from any of the universities contacted and does not intend to do so until it obtains the necessary relief from Commission staff. Such participation by other universities, as planned, would be similar to the participation by several universities in the IEM that the University of Iowa has been able to obtain.

[4] The University represents that it will implement an age and identity verification system as part of a KYC process, performed by an outside independent party: Aristotle International, Inc.

3

increase the value of the academic research generated by the project by reducing the likelihood of thinly-traded contracts. Thinly-traded contracts, the University explains, would likely allow individual users to have an outsized impact on contracts, thereby creating the potential for artificially skewed results and undermining the academic utility of the project.

**2. Access to submarket for political event contracts**

IEM limits participation in its political submarket to primarily students, faculty and staff at participating universities, and restricts participation in its economic indicator submarket to only such "academic traders." While the University proposes that participation in its economic indicator submarket be restricted to only academic traders at participating universities, the University has also proposed that trading in its political submarket not be limited to primarily academic traders. In support of its proposal, the University posits that many of the same reasons stated above for expanding the maximum number of allowable traders would also logically apply to this issue — a reduced number of traders would bias the market and reduce access to a broader range of informational sources, thereby reducing accuracy and academic utility.

**3. Larger allowable investment by any single market participant**

IEM limits the maximum investment by any single participant in any particular contract to $500. The University proposes raising the limit on investment by any single participant in any particular contract to $850. The University represents that, using the Consumer Price Index, $500 in 1992 (the year in which the Division first granted no-action relief to the University of Iowa) had the same buying power as $844.99 in 2014. The University explains that increasing the maximum allowable investment would allow participants the ability to participate in several more contracts than they might otherwise if limited to 1992 dollar levels. This, the University explains, would make its market more efficient by minimizing the likelihood of thinly-traded contracts, while still adhering to the small-dollar, educational purpose of the IEM model.

**4. Advertising would be permitted**

In its 1993 relief request, IEM represented that none of its operators, nor any other person involved with the IEM, engages in any advertising concerning the IEM. The University proposes to engage in limited advertisement of its market in media outlets where there is a high likelihood of reaching those interested in the subject matter of its contracts. Any such advertisements would prominently disclose that the proposed market is unregulated, experimental, and being operated for academic purposes. It is the University's view that limited advertisement is necessary to attract sufficient and diverse users to its proposed market.

The University represents that it will use little, if any, paid advertisements to market its contracts. Instead, the University would attract participants through channels of communication within the academic community, including word-of-mouth marketing, articles and interviews with media.

DMO notes that the University's proposed political event contracts can be distinguished from the North American Derivatives Exchange's ("Nadex") political event contracts that were

4

disapproved by Commission Order on April 2, 2012.[5] Specifically, the University's request for no-action relief was not in any way premised upon claims that its proposed event contracts have any hedging or price-basing utility. Much to the contrary, the University's proposed market for event contracts represents an academic exercise demonstrating the information gathering and predictive capabilities of markets. Another important distinction is that the University's proposed market would operate on a non-profit basis. Furthermore, because participation levels and maximum allowable investments in the University's proposed contracts would each be capped at very low levels, the University's proposed political event contracts would not have the same potential for compromising the integrity of elections as would Nadex's disapproved political event contracts, which were much larger.

## II. Scope of no-action relief provided by DMO

Based upon your representations concerning the purposes and manner of operation of your proposed market for event contracts, the Division does not believe that operation of this proposed market without registration as a DCM, FBOT, or swap execution facility ("SEF"),[6] or without registration of its operators, would be contrary to the public interest. The Division's conclusion is based upon the facts that, among others, your proposed market for event contracts has been designed to serve academic purposes and the operators will receive no compensation. Furthermore, the Division would allow the University's four proposed variations from the IEM model, as discussed above, because each is intended to produce more accurate results, which would promote the educational public interest purpose of the project while maintaining the small-scale, not-for profit nature of the proposed market.

Consequently, based upon your representations, DMO will not recommend that the Commission take any enforcement action in connection with the operation of your proposed market for event contracts based upon the operators' not seeking designation as a contract market, registering under the Act or otherwise complying with the Act or Commission regulations.

DMO does not render any opinion as to whether the operation of your proposed market for event contracts violates any state law provisions, nor does the Division's position excuse non-compliance with any such law.

This letter is based upon the information that has been provided to the Division and is subject to the conditions stated above. Any different, changed or omitted material facts or circumstances may render this no-action relief void.

This letter, and the no-action position taken herein, represents the views of DMO only, and does not necessarily represent the positions or views of the Commission or of any other division or

---

[5] *Order Prohibiting the Listing or Trading of Political Event Contracts* (April 2, 2012), *available at* http://www.cftc.gov/ucm/groups/public/@rulesandproducts/documents/ifdocs/nadexorder040212.pdf. The disapproved Nadex contracts were binary option contracts that would have paid out based upon the results of various U.S. federal elections in 2012.

[6] DMO staff believes that the proposed event contracts could be characterized as swaps pursuant to CEA section 1a(47)(A)(ii). In general, no person may operate a facility for the trading or processing of swaps unless the facility is registered as a SEF or as a DCM. *See* CEA section 5h(a)(1).

office of the Commission.  As with all no-action letters, DMO retains the authority to condition further, modify, suspend, terminate or otherwise restrict the terms of the no-action relief provided herein, in its discretion.

If you have any questions concerning this correspondence, please contact David Van Wagner, Chief Counsel, Division of Market Oversight, at (202) 418-5481 or dvanwagner@cftc.gov, or David Pepper, Attorney Advisor, Division of Market Oversight, at (202) 418-5565 or dpepper@cftc.gov.

                              Sincerely,

                              Vincent McGonagle
                              Director, Division of Market Oversight